TODD W. BURNS (SBN 194937)
todd@burnsandcohan.com
Burns & Cohan, Attorneys at Law
444 West C Street, Suite 410
San Diego, California 92101
Telephone: (619) 236-0244
Facsimile: (619) 768-0333

Attorneys for Mr. Wells

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ERIC LAMAR WELLS (1),<br><br>Defendant. | SA CR No. 12-120-CJC<br><br>Hon. Cormac J. Carney, Presiding<br><br>Date: June 26, 2013<br>Time: 9:00 a.m. |

## DEFENDANT ERIC WELLS'S OBJECTIONS TO PRESENTENCE REPORT

**TABLE OF CONTENTS**

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. MR. WELLS REQUESTS THAT THE COURT HOLD THAT THE TEN-YEAR MANDATORY MINIMUM SENTENCE REQUIREMENT OF 18 U.S.C. §2423(a) DOES NOT APPLY. . . . . . . . . . . . . . . . . . . . . . . 1

    A. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B. Statutory Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    C. Due Process Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. OBJECTIONS REGARDING OFFENSE CONDUCT. . . . . . . . . . . . . . . . 7

    A. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B. Background Information Regarding The Defendants And The Minors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1. Mr. Wells And Ms. Moore. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2. Minor #1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3. Minor #2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C. Offense Conduct And Related Objections To PSR. . . . . . . . . . . . . 10

        1. Offense Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2. Specific Objections To PSR Related To The Offense Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D. Inaccuracies In Ms. Moore's Proffer Statements. . . . . . . . . . . . . . . 12

IV. ADDITIONAL OBJECTION TO PSR. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# I.

# INTRODUCTION

Defendant Eric Wells hereby files his objections to the presentence report ("PSR"). Some of these are not what might normally be considered objections, but they are being filed as such because doing so appears most apt, and raising these issues now gives the government sufficient time to respond should it wish to do so. The sections that follow deal with the following issues.

First, relying on the Fifth Amendment's due process clause, Mr. Wells requests that the Court hold that the ten-year minimum mandatory sentence provision of 18 U.S.C. §2423(a) does not apply.

Second, Mr. Wells objects broadly to the PSR's characterization of the offense conduct, and raises specific objections in that regard.

Third, Mr. Wells raises a single objection to the PSR that does not involve the offense conduct.

# II.

## MR. WELLS REQUESTS THAT THE COURT HOLD THAT THE TEN-YEAR MANDATORY MINIMUM SENTENCE REQUIREMENT OF 18 U.S.C. §2423(a) DOES NOT APPLY

**A.   Introduction**

The presentence report indicates that the maximum custodial sentence for the offense to which Mr. Wells pleaded guilty, 18 U.S.C. §2423(a), is life, and a ten-year minimum sentence is mandatory. For the reasons given below, Mr. Wells requests that the Court hold that: (1) the ten-year minimum, and life maximum, do not apply; and (2) the maximum custodial sentence is ten years, and no minimum sentence applies. Mr. Wells begins by discussing the relevant statutory scheme, then turns to the due process argument underlying this request.

**B.   Statutory Scheme**

Sections 2421 and 2423(a) of Title 18 of the United States Code are nearly identical: both prohibit transporting a person in interstate commerce with the intent

1  that the person engage in prostitution. The one difference between the statutes is with
2  respect to whether the person transported was a minor, a factor that leads to the
3  prescribed sentence jumping from: (1) a ten-year maximum custodial term, with no
4  minimum required under §2421; to (2) a life maximum with a ten-year minimum
5  under §2423(a). And even though §2423(a) contains a knowingly *mens rea*, the
6  Ninth Circuit has held that does not extend to requiring that the government show
7  that a defendant knew the person transported was a minor. *See United States v.*
8  *Taylor*, 239 F.3d 994, 997 (9th Cir. 2001).

9  However, *Taylor* solely dealt with statutory interpretation. It did not address
10  whether the dramatic increase in sentence, based on a factor for which there is no
11  *mens rea*, violates the due process clause. Moreover, at the time *Taylor* was decided
12  the statutory maximum sentence under §2423(a) was fifteen years, and there was no
13  minimum mandatory sentence.

14  **C.    Due Process Argument**

15  In *Lambert v. California*, 355 U.S. 225 (1957), the Supreme Court struck down
16  a criminal statute because its *mens rea* requirements did not satisfy the Fifth
17  Amendment's due process clause. The defendant in *Lambert* was convicted of
18  violating a local ordinance that required convicted felons to register with local law
19  enforcement authorities, and the trial court prohibited her from presenting a defense
20  that she did not know that she was required to register. *Id.* at 227. The Supreme
21  Court began its analysis by recognizing that lawmakers have substantial latitude "to
22  declare an offense and to exclude elements of knowledge and diligence from its
23  definition," but the Court stated that the requirement of "due process places some
24  limits on" that discretion. *Id.* at 228. In part due to the "heavy criminal penalties"
25  involved in Lambert's case (*i.e.*, a $250 fine and three years of probation), the Court
26  held that the defendant's conviction violated the due process clause because there was
27  no evidence that she knew of the duty to register. *See id.* at 229-30.
28  //

*Lambert* did not provide a clear test for determining when a legislature violates the due process clause by eliminating *mens rea* from an offense, and the lower courts have taken conflicting approaches. An instructive example of this conflict is found in the differing opinions of the Third and Sixth Circuits in *United States v. Wulff*, 758 F.2d 1121 (6th Cir. 1985), and *United States v. Engler*, 806 F.2d 425 (3d Cir. 1986). In *Wulff* and *Engler*, the courts considered a federal statute proscribing the sale of migratory bird parts. The statute did not contain a scienter element, and set forth both a misdemeanor offense and a felony offense punishable by two years imprisonment and a $2,000 fine.

The Sixth Circuit in *Wulff* held that the felony provision violated the due process clause, stating: "The elimination of the element of criminal intent does not violate the due process clause where (1) the penalty is relatively small, and (2) where conviction does not gravely besmirch." *Wulff*, 758 F.2d at 1125. The court in *Wulff* concluded that the felony punishment involved in that case was not relatively small, and that a felony convicton "irreparably damages one's reputation." *Id.* at 1125. Thus, the court held that "in order to be convicted of a felony . . . Congress must require the prosecution to prove the defendant acted with some degree of scienter. Otherwise, a person acting with a completely innocent state of mind could be subjected to a severe penalty and grave damage to his reputation. This, in our opinion, the Constitution does not allow." *Id.* at 1125.

In *Engler*, the Third Circuit reached a different result in a divided opinion. The lead opinion observed that the "Supreme Court has indicated that the due process clause may set some limits on the imposition of strict criminal liability, but it has not set forth definite guidelines as to what those limits might be." *Engler*, 806 F.2d at 433. The opinion reasoned that the differences between misdemeanor penalties, for which strict liability is allowed, and the two-year felony at issue were, "for due process purposes, *de minimis*." *Id.* at 434. Accordingly, the majority opinion reversed the district court's dismissal of the indictment. The opinion explained, "To

3

decide cases on constitutional law, to be sure, is to draw lines and to make judgment calls. But where differences between misdemeanor and felony penalties are as close as they are here, we feel that the analysis takes place on a very slippery slope . . . ." *Id.* at 435. The *Engler* court noted that courts had approved of other strict liability crimes with greater penalties and concluded that the due process test should depend upon whether strict liability is being imposed "for omissions which are not 'per se blameworthy' . . . ." *Id.* at 435.

Judge Higginbotham concurred in the result, though his reasoning was very different. *See id.* at 436-41. He believed that the felony provision should be read as containing a scienter requirement. He also concluded that the difference between misdemeanor and felony penalties are significant, and imposing strict liability for the felony at issue in that case was inconsistent with the requirements of the due process clause. *See id.* at 440-41. He reasoned that there is a difference, for due process purposes, as to the propriety of "the penalty imposed for violation of the" statute and whether a defendant can "be penalized at all." *Id.* at 441. In other words, while the due process clause may allow *conviction* without proof of scienter for an offense, it may not allow imposition of the increased *penalties* that the offense entails. Accordingly, he agreed with the conclusion to reverse the dismissal of the indictment but believed that the defendant should be sentenced under the misdemeanor provision of the statute. *Id.* at 441.

The courts in *Wulff* and *Engler* did not have the benefit of the Supreme Court's subsequent decision in *Staples v. United States*, 511 U.S. 600 (1994). In *Staples*, the federal statute at issue prohibited any person from possessing a machinegun that was not properly registered, and the question before the Court was whether the government had to prove that the defendant "knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun." *Id.* at 602. In holding that the statute did require such knowledge, and thus implying

//

4

such a *mens rea* into the statute, the Court emphasized the "harsh penalty" of up to ten years' imprisonment for the offense. *Id.* at 616.

The Supreme Court reasoned that "the cases that first defined the concept of the public welfare offense [for which a legislature may permissibly forego a showing of *mens rea*] almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences, not imprisonment in the state penitentiary." *Id.* at 616 (citing 19th century American and English cases). The Court quoted Blackstone and further explained: "In a system that generally requires a 'vicious will' to establish a crime, imposing severe punishments for offenses that require no mens rea would seem incongruous." *Id.* at 616-17 (citations omitted). The Court even suggested that all felonies may require a culpable mens rea: "After all, 'felony' is, as we noted in distinguishing certain common-law crimes from public welfare offenses, 'as bad a word as you can give to man or thing.' Close adherence to the early cases described above might suggest that punishing a violation as a felony is simply incompatible with the theory of the public welfare offense." *Id.* at 618. Although the Court did not ultimately rely on the due process clause in *Staples*, its recitation of the common law supports the *Wulff*/Judge Higginbotham view discussed above. In short, that, at least in some circumstances, due process concerns require that a factor that substantially increases penalties must have some *mens rea* attached.

The government may respond that §2423(a) requires a showing that the defendant transported an individual with the intent that the person engage in prostitution, and thus, unlike the cases discussed above, there is no threat that someone will be prosecuted for purely innocent behavior. But just because an offense has some *mens rea* attached does not mean there are no due process concerns when a legislature dramatically increases penalties based on an aggravating factor for which there is no *mens rea* attached. The Supreme Court dealt with a similar question in *Mulaney v. Wilbur*, 421 U.S. 684 (1975), which focused on the Maine legislature's shifting the burden of proof to a criminal defendant with respect to the malice

aforethought element of murder. There, the State argued that once a defendant has been shown to be guilty of some type of homicide, "the defendant's critical interests in liberty and reputation are no longer of paramount concern," and thus due process concerns should not limit the State from shifting the burden of proof to the defendant to establish a lesser degree of homicide. The Supreme Court rejected that argument, because the State's "analysis fail[ed] to recognize that the criminal law of Maine, like that of other jurisdictions, is concerned not only with guilt or innocence in the abstract but also with the degree of criminal culpability." The Court went on:

> The safeguards of due process are not rendered unavailing simply because a determination may already have been reached that would stigmatize the defendant and that might lead to a significant impairment of personal liberty. The fact remains that the consequences resulting from a verdict of murder, as compared with a verdict of manslaughter, differ significantly. Indeed, when viewed in terms of the potential difference in restrictions of personal liberty attendant to each conviction, the distinction established by Maine between murder and manslaughter may be of greater importance than the difference between guilt or innocence for many lesser crimes.

*Id.* at 698. Thus, that a defendant has been found to have a *mens rea* with respect to a lesser offense does not mean that there are no due process restraints on a legislature increasing the penalty for that offense based on a factor for which a defendant had no *mens rea*. *See also Apprendi v. New Jersey*, 530 U.S. 466, 490 n.16 (2000) (indicating that re-structuring criminal statutes to eliminate right to jury determination may infringe due process guarantees). And the dramatic increase in penalty under §2423(a), with no *mens rea* attached to the factor that drives that increase (*i.e.*, minor status), is inconsistent with the due process principles set out above.

In cases similar to this, courts have often implied a *mens* rea in order to avoid having to declare a statute unconstitutional. See*, e.g., United States v. Meek*, 366 F.3d 705, 721-22 (9th Cir. 2004) (applying knowledge *mens rea* to minor status for offense under 18 U.S.C. §2422(b), to avoid declaring statute unconstitutional). However, given the Ninth Circuit's holding in *Taylor*, that is not an option. Instead, Mr. Wells requests that the Court hold that the increased penalty provision in

§4243(a) is unconstitutional, because no *mens rea* showing is required, and thus the penalty provisions in §4241 controls (*i.e.*, a ten-year maximum sentence, with no minimum mandatory sentence). This is akin to the approach Judge Higginbotham took in *Engler*.

(Notably, the Supreme Court recently granted a petition for *certiorari* in a case that may touch on this question. *See Burrage v. United States*, S. Ct. Case No. 12-7515. In *Burrage* the defendant was convicted for distribution of heroin resulting in death. *See United States v. Burrage*, 687 F.3d 1015 (8th Cir. 2012). The "resulting in death" penalty enhancement does not have a *mens rea* attached, and the Eighth Circuit has declined to imply one. *See id.* at 1020; 21 U.S.C. §841(b)(1). The Supreme Court granted *certiorari* on the question of "[w]hether the crime of distribution of drugs causing death under 18 U.S.C. §841 is a strict liability crime, without a foreseeability or proximate cause requirement.")

## III.
## OBJECTIONS REGARDING OFFENSE CONDUCT

**A.   Introduction**

The PSR gives a somewhat misleading picture of the offense conduct in this case. And it is difficult, if not impossible, to get a clear picture of what happened from the discovery produced by the government, because the two minors involved, and co-defendant Tonisha Moore, gave investigators several conflicting statements. The discussion below is aimed at providing greater clarity. It begins be describing Mr. Well's relationship with Ms. Moore, followed by some background relating to the two minors. Next is a discussion of key facts regarding the offense conduct, then specific objections to the PSR with respect to the offense conduct. Finally, there is a discussion of claims Ms. Moore allegedly made in her proffer sessions with the government (reports of which the government provided to the Court as part of its sentencing papers), because many of Ms. Moore's statements are untrue. Though the
//

last topic does not qualify as an objection to the PSR, it seems sensible to address Ms. Moore's claims regarding the offense conduct here.

**B.    Background Information Regarding The Defendants And The Minors**

    **1.    Mr. Wells And Ms. Moore**

To understand the offense conduct better, it is useful for the Court to have some insight into the relationship between Mr. Wells and Ms. Moore.

In early 2009, when Mr. Wells was twenty-one years old, he enrolled at Delta Community College in Stockton, where he met Ms. Moore. The two began dating and fairly quickly got into using cocaine together. Mr. Wells had recently lost his job as a telemarketer and was being supported by his mother. Ms. Moore was subsisting on student loans. Neither could afford their growing drug habit. To get money for drugs, Ms. Moore suggested that she engage in prostitution, and that Mr. Wells act, essentially, as her pimp. Mr. Wells agreed, but this was a new line of work for him. Not so for Ms. Moore, who was arrested in July 2005 in Oakland for prostitution.

Within a few months of when they began dating, Ms. Moore became pregnant with the couple's daughter, Karma, who was born on April 6, 2010. After Karma was born, the two promised each other that Ms. Moore would no longer engage in prostitution. But their drug addiction led them back to that activity, and they left Karma to be taken care of by Ms. Moore's mother.

The next two years were tumultuous, with Ms. Moore working as a prostitute, Mr. Wells acting as her pimp, and the two using drugs on a daily basis. Their relationship was, of course, far from ideal, but it was not what one might expect from a "typical" pimp/prostitute relationship. Though it may be hard to grasp, they believed they were in love.

    **2.    Minor #1**

As indicated in the PSR, Minor #1 was fourteen-years-old when the offense conduct underlying this case occurred. But when dressed in the manner that she favored, at 5' 8" tall and 125 pounds and with tattoos, she did not look fourteen. This

is supported by two things that happened on the day she was picked up by Anaheim police. Apparently before being picked up by an Anaheim police officer, Minor #1 had encountered another officer who saw her walking Anaheim's main prostitution strip. That first officer did not pick up Minor #1, thus he must not have thought she looked like a minor. And the officer that eventually picked up Minor #1 wrote in his report that when he encountered her he did not immediately conclude that she was a minor, but rather he thought that "she appeared young, possibly a teenager."

Aside from her appearance, prior to meeting Mr. Wells and Ms. Moore, Minor #1 had experiences that would undoubtedly cause her to present as more street savvy and "mature" than one would expect from a fourteen-year-old. Perhaps most significantly, Minor #1 had been working as a prostitute, and robbing "johns," in the months before she met the Defendants. In addition, she had: (1) been violently initiated as a member of a Boods-affiliated street gang; (2) been on probation for larceny; (3) been charged with assault in two different cases (she had allegedly assaulted her mother, a teacher, and a store clerk); (4) repeatedly run away from home; and (5) been expelled from school for fighting. She was also a daily marijuana user and had been sexually active for a long time; it would later be discovered that she became pregnant with her "boyfriend's" child well before she met the Defendants.

### 3. Minor #2

The government-produced discovery contains much less information about Minor #2, who was seventeen-years-old when the offense conduct occurred. What is known is that the two minors were working together as prostitutes, and robbing "johns," in the months before they met the Defendants. Moreover, Minor #2 told investigators that she had worked for two pimps in the past, and she was apparently looking for a new pimp when she met Mr. Wells. Incidentally, when Minor #1's mother was asked by investigators about Minor #2, she said she did not like Minor #2 because Minor #2 had falsely accused a man of rape.

//

**C.     Offense Conduct And Related Objections To PSR**

   **1.     Offense Conduct**

What follows is not a complete re-telling of the offense conduct, because much of what is set out in the PSR is correct. Instead, some aspects of the offense conduct are discussed to give the Court a more clear picture of Mr. Well's conduct.

On April 16, 2012, Mr. Wells was driving on Boulder Highway in Las Vegas when he was flagged down by Minor #2. At the time, she and Minor #1 were walking the street soliciting prostitution business. While Mr. Wells was talking with Minor #1, Minor #2 walked over and joined the conversation. The two girls said they were hungry and Mr. Wells offered to buy them some food. The girls got into Mr. Wells's car and the three went to pick up Ms. Moore, who was at the hotel where she and Mr. Wells were staying. The group got some food, and Ms. Moore and the girls seemed to hit it off. Ms. Moore told the girls that she and Mr. Wells were going to drive to Arizona, where she had some regular "clients" and where, she said, a prostitute could make a lot of money. As Minor #1 subsequently told police, after Ms. Moore befriended the girls they asked to go along to Arizona. And early in these interactions the girls told both Defendants that they were eighteen-years-old. (Although this is an issue on which the girls, and Ms. Moore, subsequently made conflicting statements, a search warrant application issued by FBI Agent Steven Wrathall explicitly states that the girls initially told Mr. Wells they were eighteen.)

The group spent the next several days in Arizona, where Ms. Moore and the two girls engaged in prostitution. Notably, in a June 2012 videotaped interview with a forensic investigator (a copy of which the government submitted to the Court for sentencing), Minor #1 said that Ms. Moore essentially acted as the girls' pimp, that Ms. Moore set up their "dates," and that the girls' always, or nearly always, gave the money they earned to Ms. Moore, who sometimes later gave the money to Mr. Wells. Minor #1 also said that Ms. Moore placed the internet advertisements that solicited

//

prostitution customers for the girls. And in her proffer statements, Ms. Moore admitted posting internet advertisements.

On April 20-21, the group traveled to Anaheim. Prior to that time, trouble had been brewing between Ms. Moore and Minor #1, apparently because Ms. Moore was criticizing Minor #1 for not "performing" well as a prostitute. There also started to be fissures in the relationship between Minors #1 and #2, apparently because Ms. Moore and Minor #2 seemed to bond, and they shut Minor #2 out of their "friendship." On April 22, Minors #1 and #2 got into an argument, after which Mr. Wells, Ms. Moore, and Minor #2 went out to eat, leaving Minor #1 behind in a hotel room. While the three were out to eat, Minor #2 first told Mr. Wells that Minor #1 was a minor. Mr. Wells then questioned Minor #2 about her birth date, at which point she admitted that she was seventeen.

While Mr. Wells, Ms. Moore, and Minor #2 were out eating, Minor #1 went for a "walk" on the streets of Anaheim and met another pimp, who asked Minor #1 to come work for him. Later, after she went back to the motel, Minor #1 told Minor #2 about this meeting, and said that the two girls should leave Ms. Moore and Mr. Wells and go work for this new pimp. Minor #2 said no, she wanted to stay with Ms. Moore and Mr. Wells.

The next morning, on April 23, Minor #1 left, telling Minor #2 she was going to work for the pimp she met the day before. She was picked up by Anaheim police, apparently soliciting prostitution, a few hours later. Mr. Wells, Ms. Moore, and Minor #2 drove to Sacramento, where they were arrested the next day.

**2.     Specific Objections To PSR Related To The Offense Conduct**

The background set out here is not meant to suggest that Mr. Wells behaved admirably. Instead, it provides a foundation for the following specific objections to the PSR.

//

//

First, contrary to what is indicated in paragraph thirteen of the PSR, when Mr. Wells drove the girls across state lines, and when they were engaged in acts of prostitution, Mr. Wells did not know they were minors.

Second, Mr. Wells did not recruit the two girls into becoming prostitutes – they were already prostitutes, and were even robbing "johns."

Third, Mr. Wells did not act in any sort of leadership role with respect to Ms. Moore. They acted as equals, though with Ms. Moore playing a much more pivotal role. Thus the upward adjustment for role recommended in paragraph forty of the PSR should not be applied.

Fourth, as recognized in paragraph thirty-six of the PSR, Mr. Wells did not do anything to coerce the girls, or to prevent them from making their own choices. Indeed, when Minor #1 wanted to leave, she left.

**D.     Inaccuracies In Ms. Moore's Proffer Statements**

As mentioned above, the government has provided to the Court copies of two reports relating to Ms. Moore's proffer statements. One important thing Ms. Moore said in those statements is true – that neither she nor Mr. Wells knew the girls were minors until after they reached California. However, in an effort to shift responsibility to Mr. Wells for her conduct, Ms. Moore made several false claims.

First, Ms. Moore claimed that prior to meeting Mr. Wells she had never been involved in prostitution, and that Mr. Wells got her into that business. That is untrue, as evidenced by Ms. Moore's July 6, 2005 arrest for prostitution (reflected on her rap sheet produced in discovery), which occurred long before she met Mr. Wells.

Second, Ms. Moore claimed that Mr. Wells gave the girls marijuana, but Minor #1 made clear in her videotaped statement that Ms. Moore provided the girls with marijuana.

Third, Ms. Moore claimed that Mr. Wells was always the one who took the prostitution proceeds from the girls, but the girls gave contrary statements, saying Ms. Moore almost always, or always, took those proceeds.

Fourth, Ms. Moore portrayed Mr. Wells as being heavily involved in drug dealing and having several prostitutes working for him. Those allegations are false, and if true Mr. Wells would undoubtedly have a much more serious criminal history than he does. It is telling that all of Mr. Wells's criminal history (save for a juvenile incident) occurred after he met Ms. Moore, and all of it involved Ms. Moore.

Fifth, Ms. Moore tried to claim that Mr. Wells was responsible for posting all the internet advertisements for "johns," but the computers used all belonged to her, and Minor #1 said Ms. Moore posted the advertisements.

Finally, Ms. Moore claimed that Mr. Wells was violent with her. Her claims aside, nothing in this case shows Mr. Wells to be a violent person. And while Mr. Wells admits that his relationship with Ms. Moore was at times volatile, Ms. Moore was no stranger to acting violently. And at 6' 3" tall and 170 pounds, she can deliver on her violent tendencies.

There is a final point to note here. At the end of Ms. Moore's second proffer session, she was asked why she had been dishonest during her prior proffer session. Ms. Moore reportedly responded that it was because she wanted to protect Mr. Wells. That is untrue – in both proffer sessions, Ms. Moore said damaging, and untrue, things about Mr. Wells, in an effort to blame him for her conduct.

## IV.

## ADDITIONAL OBJECTION TO PSR

Mr. Wells has one additional objection to the PSR, which does not relate to the offense conduct section. Paragraph twenty-three of the PSR indicates that Minor #1 stated that she was raped while prostituting herself in Arizona. That is incorrect, and appears to be based on a mis-communication between Minor #1 and a social worker who interviewed her. Minor #1 apparently told that social worker that she was raped while working as a prostitute on Boulder Highway in Las Vegas. That occurred before Minor #1 met Mr. Wells and Ms. Moore.

//

# V.

# CONCLUSION

Mr. Wells requests that the Court sustain the objections set out above, and that the Court consider Mr. Well's true offense conduct in imposing a sentence of less than ten years.

Respectfully submitted,

DATED: June 3, 2013         */s/ Todd W. Burns*
                            TODD W. BURNS
                            Counsel for Mr. Wells

# **CERTIFICATE OF SERVICE**

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of information and belief, and that a copy of the foregoing document has been caused to be delivered this day upon counsel for the Plaintiff in this case, Mark Takla, via ECF/NEF.

Dated: June 3, 2013                     */s/ Todd W. Burns*
                                         Attorney for Mr. Wells
                                         444 West C Street, Suite 410
                                         San Diego, California, 92101
                                         Phone: 619-236-0344
                                         Fax: 619-768-0333